# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE
January 11, 2011 Session

## STATE OF TENNESSEE v. ERIK GUERRERO

### Direct Appeal from the Circuit Court for Maury County
#### No. 17883     Robert L. Holloway, Judge

_____

### No. M2010-00851-CCA-R3-CD - Filed July 25, 2011

_____

A Maury County jury convicted the Defendant, Erik Guerrero, of two counts of first degree premeditated murder, two counts of first degree felony murder, and nine counts of attempted first degree murder, and the trial court sentenced the Defendant to an effective sentence of life in the Tennessee Department of Correction.  The Defendant appeals his conviction claiming that: (1) the evidence is insufficient to support his convictions; (2) the trial court erred when it allowed proof of the Defendant's gang membership to be admitted into evidence at trial; (3) the trial court erred when it allowed a recorded telephone conversation between the Defendant and a co-defendant to be admitted into evidence at trial; (4) the trial court erred when it allowed the Defendant's statements made at the scene of the crime to be admitted into evidence at trial; and (5) the trial court erred when it failed to instruct the jury as to the natural and probable consequences rule.  After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JERRY L. SMITH, J., and DAVID H. WELLES, SP. J., joined.

J. Russell Parkes, Columbia, Tennessee, for the Appellant, Erik Estrada Guerrero.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Michel T. Bottoms, District Attorney General, for the Appellee, State of Tennessee.

## OPINION
## I. Background

This case arises from a shooting that occurred while two vehicles traveled down a

highway on April 13, 2008, in Maury County, Tennessee. The police investigation in this case revealed that after a fight broke out during a party at the National Guard Armory, police intervened and dispersed the crowd. Two vehicles, a gold Pontiac Grand Am and a Ford Expedition, both containing persons who had attended the party at the Armory, were traveling down Nashville Highway when passengers in the Pontiac Grand Am fired at the Ford Expedition, shooting four passengers, two of whom died as a result. The Defendant was a passenger in the left rear seat of the Pontiac Grand Am at the time of this incident.

A Maury County grand jury indicted the Defendant for two counts of first degree premeditated murder, two counts of first degree felony murder, nine counts of aggravated assault,[1] and nine counts of attempted first degree murder. At the Defendant's trial on these charges, the following evidence was presented: Sarah Garcia, who was nineteen at the time of trial, testified that in April 2008 she was in a relationship with and living with Jose Castro, the owner of the Ford Expedition. Around 10:00 p.m. on the night of April 12, 2008, Garcia traveled to a birthday party at the National Guard Armory in Columbia, Tennessee, in Castro's Expedition accompanied by Castro, Patricia Garcia, who was her sister; Jason and Juan Castro, both younger brothers of Jose Castro; and Dalila Cortinas, Jose Castro's cousin. They remained at the party until midnight when a fight broke out and police arrived and escorted people out of the building. When Sarah Garcia and Jose Castro left the Armory, several additional people accompanied them in the Expedition. Sarah recalled Jose was in the driver's seat and she rode in the front passenger seat. Four people were in the second row of seating, including Patricia Garcia, and three people were in the third row of seating. There were two more people were in the back of the Expedition.

Sarah Garcia testified that, as they drove home, she was talking with the other passengers in the Expedition when Jose called their attention to a car approaching with its lights off, which he thought might be a police officer. He warned the passengers who were riding in the back of the Expedition to remain still because they were not all wearing seatbelts. Sarah recalled that she turned as the car was passing them and saw a light, which she later realized was gunfire, in the front passenger seat of the vehicle. She said that the gunshots "didn't stop" and Jose threw her onto his lap and told the passengers to "get down." Garcia said, "I just remember thinking when is this going to stop? Because they just kept going." Garcia testified that she was shot in her left leg but did not realize it until they were driving to the hospital after the shooting. Garcia recalled that she heard Juan Castro, Jose's younger brother, say that he had been shot and Jason Castro, Jose's nine-year old brother, yell to Jose, "Hurry up, [Juan] is not breathing." Sarah said that Jose drove the SUV to the hospital, and that during the drive she tried to talk to her sister, Patricia, but Patricia did not respond.

---

[1] The judgment form indicates the aggravated assault counts were dismissed/Nolle Prosequi.

At the hospital, Sarah learned that she had a femur fracture, shattered bone, and a broken artery and vein that required three surgeries within the week of the shooting. She was confined to a wheelchair for a month, and thereafter required a walker for two months. For the following three to four months, she walked on crutches. Garcia testified that, prior to the night of the shooting, she had never seen or heard of the Defendant or his co-defendants.

Garcia testified that her sister, Patricia Garcia, twenty-four years old and the mother of three at the time of the shooting, died as a result of the gunshot wounds.

Jose Castro confirmed that on April 12, 2008, he attended a birthday party at the National Guard Armory. Jose[2] recalled that it was a large party and that, later in the evening, a fight broke out, which resulted in police escorting people from the building. Jose said that he was not involved in the fight and did not know the Defendant or his co-defendants. After the fight, Jose got into his orange 1997 Expedition along with ten other people, none of whom were wearing a Titans jersey. Jose was driving down Nashville Highway when he noticed a car behind him that, for approximately a mile, repeatedly pulled up close to his car and then slowed down. Initially, the lights on the car were on, but when Jose stopped at a stop light he noticed they were turned off. Jose recalled the car coming alongside his Expedition after which he heard gunshots. In response, Jose rammed his Expedition into the car to run it off the road to stop the shooting. After running the car off the road, Jose drove to Williamson Medical Center. Jose said that his younger brother, Juan Castro, was covered with blood and shaking when they arrived at the hospital, and that he later died due to his injuries. Juan said that he sustained a gunshot wound in the thigh, which prevented him from walking for three to four months. Juan testified that his vehicle contained no weapons at the time of this shooting.

Carlos Landauro testified that he attended the party with Jose Castro, and he confirmed that a fight, in which he was not involved, occurred before the group left in Jose's Expedition. Landauro, seated behind the driver's seat next to Patricia Garcia, heard gunfire and then saw Patricia fall forward. Landauro, who was not injured in the shooting, did not know the Defendant or any of his co-defendants.

Jason Castro, eleven at the time of trial, testified that he went to a party with his family. Jason confirmed he had two brothers Juan, who was sixteen when this shooting occurred, and Jose. A disturbance occurred during the party and Jason heard "beer bottles and chairs crashing on the floor." Police soon arrived, and Jason left the building and got into the very

---

[2] Whereas, we normally refer to victims by their last name, because there are multiple victims with the last name "Castro," we refer to them by first name. We mean no disrespect to the victims and only do so for clarity.

back of Jose's Expedition. As they were driving home, Jason heard Jose tell everyone to "duck," and then he saw "just like sparks all over the truck." He heard Juan say that he had been shot, and he saw Juan lying down and bleeding. Jason, who was not injured during this incident, recalled that Juan could not speak, and he was "breathing hard."

During cross-examination, Jason agreed that in his statement to police after the fight at the Armory he said that his brothers had hit someone and were, therefore, forced to leave because they had been in a fight.

Jeremy Humphrey, a Columbia Police Department officer, testified that early on the morning of April 13, 2008, he responded to a report of a disturbance at the National Guard Armory. Being one of the last units to respond, however, he found the situation already resolved when he arrived. Humphrey left the National Guard Armory and was en route to a police substation when he heard a police report of a shooting "in the 1700 block of Nashville Highway," which was close to where he was driving. Officer Humphrey responded, and upon arriving he immediately noticed that the road "sparkled" from broken glass and that a "really bright orange tennis shoe" lay on the roadway. A truck, a wrecked gold Pontiac Grand Am, and another small sedan were at the scene. Officer Humphrey saw a hispanic male, he later identified as Robert Guerrero, and a white male talking. In order to ascertain if a shooting had occurred and, if so, the nature of the men's involvement in the shooting, Officer Humphrey exited his patrol car with a weapon drawn and ordered the men to place their hands in the air. As Officer Humphrey was making this initial contact, the Defendant came out of a ditch on the driver's side of the wrecked Grand Am and placed his hands in the air. After back-up arrived, Officer Humphrey returned his weapon to the back of his vehicle, believing no shooting had occurred. The officers began working the scene as an aggravated assault traffic accident.

Officer Humphrey testified that, as he was gathering information about the traffic accident and waiting on a wrecker for the gold Grand Am, he noticed the Defendant walk into the ditch on the passenger side of the Grand Am. Officer Duke, another officer at the scene, instructed the Defendant to return to the roadway, and the Defendant complied. Officer Duke then went into the ditch where the Defendant had been, returned to the roadway, and spoke with another officer. Officer Duke then handcuffed the Defendant and instructed Officer Humphrey to handcuff Robert Guerrero. The officers provided both men with Miranda warnings.

Officer Humphrey testified that both men were placed in the back of police cruisers, and their hands were covered with bags to preserve any gunshot residue that might have been present. After the Defendant's hands were bagged, but before the gunshot residue test was administered, the Defendant asked Humphrey how long gunshot residue remains on one's hands after firing a weapon.

-4-

Tracy Duke, a Columbia Police Department officer, testified that he responded to a call at the National Guard Armory where he assisted in crowd control. Officer Duke explained that a fight had occurred inside but was broken up by the time he arrived, so he remained in the parking lot as people exited to ensure there were no further altercations. After Officer Duke left the Armory, he heard a police report for a shooting incident in the area of "1700 Nashville Highway." He responded, and noticed "a lot of glass in the roadway," skid marks in the road, and a gold Pontiac Grand Am in a ditch. Officer Duke saw Officer Humphrey speaking to Robert Guerrero and the Defendant at the rear of the Grand Am and then noticed the Defendant walk around the passenger side of the car, past the open door of the car, and into the ditch. Officer Duke asked the Defendant to return to the pavement, telling him he could inspect any damage to the car after the wrecker pulled it from the ditch. The Defendant returned to the road, and Officer Duke walked over to the ditch where the Defendant had been looking. Standing where the Defendant had been standing, Officer Duke saw within arm's reach an assault rifle lying on the ground immediately in front of him and slightly to the right. Officer Duke told Officer Ribley about the gun, and the officers handcuffed Robert Guerrero and the Defendant.

After the two men were placed under arrest, Officer Duke assisted Officer Ribley in a safety sweep of the vehicle. The officer observed that the arm rest in the middle of the back seat was folded down, allowing access to the trunk, and a blanket was pulled halfway through this opening.

On cross-examination, Officer Duke said that, when the Defendant walked around the Grand Am and appeared to be looking at something in the ditch, the Defendant stood for a moment, bending over the area where the gun later was recovered.

Scott McPherson, a Columbia Police Department officer, testified he was summoned to the scene in this case because a rifle had been found. Officer McPherson observed a black rifle, installed with a loaded magazine, lying on the ground near the front right passenger side of the gold Grand Am. After collecting this rifle, Officer McPherson also collected a cigarette lighter from the shoulder of the road, a shoe from the roadway, another shoe from the ditch, and a green bandana. While at the scene, the officer collected swabs from the Defendant's hand to send to a lab for gunshot residue testing.

Jeremy Haywood, a Columbia Police Department officer, testified that he received a call for back-up assistance needed at the National Guard Armory. When he arrived, a large group of people were attempting to exit the building. Officer Haywood went inside where he saw a large group of Hispanic men and a deputy who was engaged in a "verbal disagreement" with Javoris Sparkman, a co-defendant in this case. Officer Haywood said that he was acquainted with Sparkman and noticed Sparkman that night because Sparkman was the only African-

American man at the Armory and because he was refusing to comply with the deputy's requests. Officer Haywood testified that the deputy was trying to quell an argument between Sparkman and the Hispanic men. After Officer Haywood saw the Hispanic men exit the Armory in compliance with the deputy's instructions, he saw Sparkman attempt to follow the men. Officer Haywood intervened and stopped Sparkman, instructing Sparkman to exit through another door, and Sparkman "stood off with [him] for a few seconds" but then eventually turned and exited through another door. Officer Haywood followed Sparkman out of the building and then returned to assist in vacating the rest of the people from the Armory.

Officer Haywood testified that, at the end of his shift, he went to the office where, from an observation room, he observed Detective Andre Martin interview the Defendant, who had been taken into custody. The detective asked the Defendant about Sparkman, and the Defendant responded that before the fight at the Armory "they" had left with Sparkman and dropped him off at his girlfriend's house. Officer Haywood informed another officer also in the observation room that this was untrue because he had escorted Sparkman from the Armory after the fight.

Officer Haywood recalled that after the conclusion of the detective's interview of the Defendant, Officer Haywood saw the Defendant seated in a chair. The Defendant looked at Officer Haywood and asked, "You were at the Armory earlier during the fight, wasn't you?" When Officer Haywood replied that he had indeed been at the Armory, the Defendant then asked, "So you know everybody that was there and you know who all . . . was at the fight and who all left?" Officer Haywood agreed and told the Defendant that he knew the Defendant lied to Detective Martin about Sparkman. Officer Haywood recalled that the Defendant began to "tear up."

Officer Haywood privately advised a detective involved with the case, Lieutenant Jones, about his conversation with the Defendant and suggested that the Defendant might give a statement because he had been caught lying. In response, Lieutenant Jones and Officer Haywood interviewed the Defendant. Officer Haywood described the Defendant during this interview as "very emotional" and "shaking and crying." The Defendant told the officers that giving a statement to the police was very difficult due to the "repercussions" he would face "on the street." Officer Haywood asked the Defendant if he was affiliated with a gang, and the Defendant said that both he and Robert Guerrero were members of a gang known as the "Vikings." The Defendant stated, "If you roll over on a fellow folk then you pay in the streets." The Defendant informed the officers that Sparkman was a member of another gang, the "Gangster Disciple[s]." When asked how the two gangs were associated, the Defendant stated, "We are all folk."

Officer Haywood testified that, when the officers asked the Defendant if Sparkman was in the car at the time of the shooting in this case, the Defendant responded, "You already know the answer to that." They asked the Defendant why the shooting occurred, and he stated, "Look, I'm going to do this for me and my cousin, but I'm only going to do this one time, so get all you need from me now. I do not want to be recorded and I do not want you to write anything down."

Officer Haywood recounted the story the Defendant told them of the incident as follows: the Defendant said that there was a fight at the Armory, and Sparkman believed the people involved in that fight left the Armory in the Expedition. The Defendant described the seating arrangement in the vehicle he was in as follows: Robert Guerrero, the Defendant's cousin, was in the driver's seat; Sparkman was in the front seat; and the Defendant was in the driver's-side backseat. The men left the Armory traveling north on Nashville Highway when they saw the Expedition that Sparkman identified from the Armory incident. The Defendant explained that Sparkman reached into the backseat, pulled the center console down to access the trunk, and retrieved the gun. The Defendant said that he knew what Sparkman was about to do and that he told Sparkman "not to do it, because there was another car coming up . . . that . . . would see him." Robert Guerrero pulled up alongside the Expedition, and Sparkman began to shoot, firing multiple times. The Defendant covered his face with a blanket until he felt a hard jolt and, looking out from under the blanket, saw the Expedition ram the side of their car, causing them to go across the median and into the ditch. Sparkman jumped out of the car, threw down the gun, and Sparkman and the Defendant began to flee the scene. The Defendant told Sparkman to go back and get the gun because it was "evidence" they should not leave behind, but Sparkman continued to run. The Defendant returned to the wrecked vehicle because he did not want to leave his cousin, Robert Guerrero, to "take the rap for the shooting." When he returned to search for the gun to get "rid of it" and to talk Robert Guerrero into fleeing, he could not find the gun, and Robert Guerrero asked him to help get the car out of the ditch. After the two men tried unsuccessfully to get the car out of the ditch, police arrived. When questioned by the police, the Defendant denied that a shooting had taken place and told police they had been run off the road by a red truck.

The Defendant told the officers during the interview that, when a police officer found a rifle near the front passenger side of the car, he knew the officer had found the gun Sparkman used in the shooting. Several times during the interview the Defendant stated that he knew "there was no way they would not get caught, because there were way too many people around and far too much evidence." He knew that police would match the rounds found in the car to the rifle found in the ditch and that they would find "the shooter's" prints on the rifle because "the shooter" was not wearing gloves when he fired the rifle at the Expedition. When asked if the gun was Sparkman's, the Defendant explained that it was a "throw-down gun that everyone had access to," and that "it was in the car due to all the problems in the streets." The

Defendant denied shooting the gun that night but said that his and Robert Guerrero's fingerprints might be found on the gun because both previously had shot the gun. The Defendant denied that any other weapon was fired and maintained that only three men were in the car during the shooting. The Defendant said, "[I]f the people in the Expedition were honest, innocent victims, that he did feel very sorry for what happened and to their families." He continued, "[I]f the people were affiliated with the gang world, . . . he felt no remorse for any of them because that is the life that they chose to lead." The Defendant told the officers that "[H]e should not be felt sorry for, because just like them, this is the life that he chose to live. And the fact that he is involved is just a product of that life."

Andre Martin, a Columbia Police Department detective, testified that he interviewed the Defendant on April 13, 2008, before the Defendant's interview with Officer Haywood and Lieutenant Jones. The Defendant told the detective that, after a fight had broken out during a party at the National Guard Armory, he and his cousin, Robert Guerrero, left. He said that, as they were driving down Nashville Highway, an SUV of unknown make or model ran into their car for no apparent reason. The Defendant denied knowledge of a shooting and refused to discuss the incident any further. Detective Martin asked the Defendant to write out his statement, and, while the Defendant did so, the detective stepped into the hallway, where Lieutenant Jones instructed him to "ask [the Defendant] about Javoris Sparkman."

Detective Martin returned to the room and, when he asked the Defendant about Sparkman, the Defendant replied that Sparkman had been dropped off at "his girlfriend's" before they went to the National Guard Armory. The detective had no further contact with the Defendant on this day. The following day, a Maury County Sheriff's Correction Officer notified the detective that the Defendant wanted to speak with him. The detective met with the Defendant and took an oral statement, which he later reduced to writing. Detective Martin read the following summary of the Defendant's statement into the record at trial:

> On 4/14 [ ]- on 4/14/08 I was contacted in General Sessions Court by Maury county Sheriff's Correction Officer, Berry Thompson, that [the Defendant] wanted to speak to me about this case. He also left a message on my voice mail recording in my office the night before.

> Later in the evening, Detective Jeremy Alsup and I spoke to [the Defendant] at the Maury County jail, when he was reminded of his Miranda rights again, which he understood.

> Alsup and I had to clarify [], to [the Defendant], that it was his desire to speak to me about this case via Correction's Officer Thompson. And he replied that it was his desire to talk with Alsup and I. And there were no

promises or threats made to [the Defendant] by Alsup or I as well for the statement he was giving.

Detective Alsup wrote out [the Defendant's] statement to us, that he did not wish to have recorded or audio taped. And [the Defendant] did sign that statement along with the Officer and myself.

During this conversation with [the Defendant] [], [the Defendant] told Alsup and I that all four had been at a party at the National Guard Armory just after a big fight had occurred, with some of the participants in that fight being members from the Serenario's (phonetic) 13 gang or Serf 13 gang, which is said to affiliate with the MS 13 gang.

[The Defendant] claimed gang affiliation with the Insane Vikings, or a part of the Gangster Disciples. Robert claimed [ ], this affiliation to me the day before.

[The Defendant]went on to say that while the four, his cousin, Robert Guerrero, Javoris Sparkman, Chas, also [known as Charles Kelley] were about to leave the party. That they did not have a fight in.

And Robert was pushed by a Serf 13 member, who knew Robert to be a Viking. [The Defendant] said that Sparkman and he then pushed the guy back and told him to chill. And [the Defendant] stated that the Serf 13 member had on a light blue [Titans] jersey that had either the number eight or nine on it.

He then told us that Robert, Sparkman and he were escorted out of the building by a police officer. And they met up with [Kelley] in the parking lot.

[The Defendant] stated that Robert felt like he was disrespected by the Serf 13. And said that Sparkman then watched the Serf 13 member get into an SUV that Sparkman thought was the same as the victim's vehicle. But it turned out not to be the same vehicle.

[The Defendant] then said that he told Robert to take him home to the creek, which is Mill Creek, that is Mill Creek Subdivision off of Nashville Highway. Erik stated that while driving up Nashville Highway the victim's vehicle was spotted in the right lane at Eastburg Drive and the light (inaudible) [C]oca [C]ola Plant, by Sparkman.

-9-

[The Defendant] stated that Javoris Sparkman was then handed an SKS riffle [sic] that Robert keeps in the trunk of his girlfriend's car for protection, by[Kelley], who was sitting behind Sparkman in the rear passenger's seat. [Kelley] got the weapon from out of the trunk by pulling a rear ah, passenger hatchback or seat back back, which gave him access to the trunk.

[The Defendant] went on to say that [Kelley] then pulled a 38 Revolver out of his pocket after handing the SKS to Sparkman. [The Defendant] stated that Robert got caught up in the moment by driving the gold-colored four-door Pontiac Grand Am up to the victim's vehicle in the left lane.

[The Defendant] stated he looked back and saw another vehicle behind them and told them so. [The Defendant] stated he told them about the car behind them so they wouldn't shoot with a witness vehicle around.

[The Defendant] then said that Sparkman and [Kelley] started shooting at the victim's vehicle about four seconds north of the Coca-Cola Plant, just after he had pulled a blanket up over his body.

And that blanket was later found in the ah, rear seat of the vehicle by Detective Cory Cooper. And turned his head while sitting in the rear driver's side seat. [The Defendant] stated that after being shot several times, the victim's vehicle then turned into the right side of Robert's girlfriend's vehicle with his front driver's side, knocking into the grass median. And left the scene out of his sight, going north on Nashville Highway.

[The Defendant] stated that the vehicle they were in then slid across the grass. And when the front tires caught hold of the pavement in the southbound lane it scooted across both lanes and got stuck in the ditch, with the front end facing south.

[The Defendant] stated [Sparkman?] and [Kelley] exited the vehicle and ran south on Nashville Highway through a field going towards American Mobile Village. [The Defendant] said that before Sparkman ran into the field he yelled and asked where the gun was. And [Sparkman] responded by saying he threw it into the bushes while still running.

[The Defendant] stated that [Kelley] still had the 38 Revolver on his person. [The Defendant] stated he ran away at first, changed his mind, and then went back to help Robert get the car unstuck, because he didn't want him

-10-

to take the fall by himself.

[The Defendant] stated that he looked for the gun and couldn't find it. And that's when the police arrived shortly after, before he could find it.

[The Defendant] stated that if he had found the gun he would have taken off with it and we wouldn't be having this conversation.

[The Defendant] did not originally tell Alsup and I about[Kelley's] involvement because he wanted to protect him. But after Alsup brought his name up, he felt that we knew that there were other bullets fired besides the rounds from the SKS. He said he knew 38 bullets would be found, which he knew [Kelley] had fired.

[The Defendant] was very emotional throughout the conversation, as he cried several times about what had been done and that he felt he couldn't stop it.

[The Defendant] also shared with Detective Alsup and I that he had had a conversation from the telephone in the booking area with Charles Kelley . . . . . .

Upon learning of the telephone conversation between the Defendant and Charles Kelley, Detective Martin said that he obtained a tape recording of the conversation, which was played for the jury. We summarize the conversation as follows: The Defendant called Kelley and told him he was in jail and that police were charging him with two first degree murders. Kelley responded that he knew, "Tiff" had told him. The Defendant did most of the talking during the call and twice silenced Kelley, preventing Kelley from speaking. The Defendant warned Kelley multiple times that the "evidence would play out" and that "time would tell." In response, Kelley said "yeah" or "yeah, I know." Kelley also said multiple times, "the situation is critical" or "this s*** is ugly." During the conversation the Defendant referred to Sparkman as "that one," and Kelley responded by asking if the police knew about "this one." The Defendant later told Detectives that Kelley was referencing himself when he said "this one." Kelley asked the Defendant where they found the weapon, and the Defendant explained that he tried to run but could not leave his cousin so he returned and looked for the gun to dispose of it, but did not find it. The Defendant told Kelley that when police arrived, they told police that they were rammed by another car but a police officer shone a light on the gun, which was located by the right front passenger door of the car. The Defendant also told Kelley that it "was all about how you tell them" referencing his discussions with police regarding the shooting incident. Kelley told the Defendant that "Tiff" had told him that someone in the

-11-

victim's vehicle had seen someone in the Defendant's vehicle wearing a yellow shirt.

On cross-examination, Detective Martin testified that he did not take notes during the interview, but used Detective Alsup's notes to "refresh his memory" when he wrote the summary twelve days later. Detective Martin agreed on re-cross that the Defendant's statement on the 14th was similar to the statement he gave Officer Haywood the day before except that the statement from the 14th mentioned wiping gunpowder from the backseat of the car and described Kelley's involvement in the shooting.

Jeremy Alsup, a Columbia Police Department detective, testified that he was the lead detective in this case and was at the shooting scene about a half-hour before proceeding to Williamson Medical Center. Detective Alsup said that, when he arrived at the hospital, two of the victims, Patricia Garcia and Juan Castro, had already died, and two other victims, Sarah Garcia and Jose Castro, had been transported to Vanderbilt Hospital for treatment. He and another detective interviewed the remaining seven victims who remained at Williamson Medical Center. Thereafter, the detective met with Dr. McMaster and learned that 38-caliber bullets had been extracted from the two deceased victims' bodies. These 38-caliber bullets were inconsistent with the Defendant's statement that only one shooter acted using an assault rifle. During the day, he was notified that the Defendant wanted to make a statement, so he met with the Defendant at the Maury County jail. The Defendant did not want the interview audiotaped or videotaped and wanted the detective to write his statement for him.

Detective Alsup testified that, before taking the Defendant's statement, he had already interviewed Charles Kelley and also had information indicating that at least two weapons were involved in the shooting. In his statement to Detective Alsup the Defendant did not mention Kelley's presence during the shooting. After the Defendant signed the statement written by Detective Alsup, the detective said they needed to discuss Kelley, and the Defendant became "tearful," saying he had anticipated that the evidence would show that another person was present during the shooting. The Defendant confirmed to police that Kelley had been present during the shooting and said that Kelley had fired at the Expedition with a .38 revolver. The Defendant told the detective what to listen for on the phone conversation between the Defendant and Kelley. The detective agreed that the written statement he prepared for the Defendant read, in one part only, "Bro, there's a car behind us," with no mention of potential witnesses as the detectives had testified. He explained that he was limited in what he could write down but he recalled the Defendant specifically saying that he told Sparkman that there were witnesses and someone might see. Detective Alsup also said, in explaining why his notes did not mention the Defendant's mention of witnesses, that he knew that Detective Martin, also in the room, would be drafting a more complete summary of the interview.

On cross-examination, Detective Alsup agreed that the handgun used in this shooting

had not been recovered, and that the results of the gunshot residue test indicated that the Defendant did not have any gunshot residue on his hands the night of the shooting. He agreed that, at the preliminary hearing, when defense counsel asked, "So [] the only thing that we really have as we sit here today is the presence of [the Defendant] in the vehicle that night," he responded, "[T]hat is correct." The detective explained that the preliminary hearing was fifteen days after the shooting and that he spent seven of those days in job-related training in Miami. Upon further review of the evidence collected, he now believed the Defendant played a role in the shooting.

Cory Cooper, a Columbia Police Department detective, testified that, on April 13, 2008, he responded to a shooting scene on Nashville Highway. Detective Cooper said that, after recovering paint chips from the debris and the gold Grand Am, he took a paint chip from the victims' Expedition and sent both sets of paint chips to the Tennessee Bureau of Investigation for analysis. He said the Expedition had body damage, two shattered windows, blood in all compartments of the vehicle, and nine gunshot holes. The detective said that, based upon his investigation, he was able to conclude that the gunshots entered the vehicle from the driver's side.

Miranda Terry, an agent with the Tennessee Bureau of Investigation ("TBI"), testified as an expert witness in the field of micro-analysis. Agent Terry said that she analyzed paint chips collected from both the victims' Expedition and the gold Grand Am and concluded that all of the paint chips submitted were from the same source indicating that these two vehicles had collided.

Mark Dunlap, a TBI forensic scientist, testified as an expert in the field of Serology and DNA. Agent Dunlap analyzed evidence submitted from this crime as well as a DNA sample from the Defendant. The agent found a mixture of DNA from at least four individuals on a green bandana recovered from the scene. Upon comparison with the Defendant's DNA sample, Dunlap said that he could not rule the Defendant out as a contributor to the DNA profiles found on the green bandana. On cross-examination, Agent Dunlap agreed that he did not find any genetic markers from the Defendant on any genetic material found on the assault rifle recovered in this case.

The previous sworn testimony of Dr. Amy McMaster, a forensic pathologist, was read into the record at trial. Dr. McMaster's testified as an expert witness in the field of forensic pathology that she performed an autopsy on Patricia Garcia. Garcia's body had a gunshot wound to her head where the bullet traveled from the back of her body to the front. Dr. McMaster said that she recovered a "medium caliber deformed bullet" from Garcia's brain and a small fragment from a laceration near the entrance wound. Dr. McMaster testified that, based upon the gunshot wound, she estimated Garcia's death was "instantaneous or near

-13-

instantaneous."

Dr. McMaster testified that she also performed an autopsy on the body of Juan Castro. Juan had three gunshot wounds to his body. Two of the wounds were located on the back of his torso, and the third wound was on the back of his right shoulder. The gunshot wound located on the right side of his torso injured his heart and lung and was fatal, and the other two wounds "did not appear to be life threatening." Dr. McMaster said that she recovered two medium caliber, deformed bullets from Juan's body.

Steve Scott, who works in the Crime Laboratory for the TBI, testified as an expert witness as to firearm identification. Agent Scott testified that he examined the magazine and the semi-automatic rifle recovered in this case. He compared bullets recovered from victim Sarah Garcia's leg to bullets shot for testing purposes from the recovered weapon and determined that the bullet retrieved from victim Sarah Garcia's leg was shot from the rifle recovered at the scene. Agent Scott examined another bullet recovered from victim Patricia Garcia's brain and a bullet fragment from her scalp and concluded that the bullet and bullet fragment were not from a semi-automatic rifle but from a revolver. Agent Scott also examined 38-caliber bullets recovered from the chest and shoulder of victim Juan Castro and determined that they were the same type and design as the bullets recovered from victim Patricia Garcia and fired from the same weapon.

At the close of the State's proof, the Defendant made a motion for a judgment of acquittal which the trial court denied. The Defendant then offered the following proof: Oakley McKinney, a retired forensic scientist with the TBI, testified as an expert in the field of fingerprint analysis. McKinney said that, before he retired, he received a rifle, shoes and a coke bottle for fingerprint examination and that he found no identifiable prints on the rifle.

James Davis, a TBI forensic scientist, testified as an expert in the field of forensic science. Davis testified that the result of the gunshot residue test performed on the Defendant was negative.

Following this evidence, the Defendant renewed his motion for a judgment of acquittal and the trial court again denied the motion.

Based upon the evidence, the jury convicted the Defendant of two counts of first degree premeditated murder, two counts of first degree felony murder, and nine counts of attempted first degree murder. The trial court merged the first degree felony murder convictions with the first degree premeditated murder convictions and ordered the Defendant to serve a life sentence for each of the first degree murder convictions and a fifteen-year sentence for each of the nine attempted first degree murder convictions, all sentences running concurrently, for

a total effective sentence of life in prison.  It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant claims that: (1) the evidence is insufficient to support his convictions; (2) the trial court erred when it allowed proof of the Defendant's gang membership to be admitted into evidence at trial; (3) the trial court erred when it allowed a recorded telephone conversation between the Defendant and a co-defendant to be admitted into evidence at trial; (4) the trial court erred when it allowed the Defendant's statements made at the scene of the crime to be admitted into evidence at trial; and (5) the trial court erred when it failed to instruct the jury as to the natural and probable consequences rule.

### A. Admission of the Defendant's Gang Affiliation

The Defendant asserts that the trial court erred when it admitted evidence of the Defendant's and co-defendants' gang affiliations because such evidence was not relevant and was "overly prejudicial" to the Defendant.  The State responds that the trial court properly admitted the evidence because it was relevant to show his motive for assisting the co-defendants in shooting the victims.

At trial, police officers testified that the Defendant made statements to the officers admitting his gang affiliation.  After a jury-out hearing, the trial court ruled that the Defendant's statements regarding his gang affiliation were relevant to show the Defendant's motive and intent in assisting his co-defendants in the shooting and that the probative value of this evidence was not outweighed by the danger of unfair prejudice.

The Tennessee Rules of Evidence provide that all "relevant evidence is admissible" unless excluded by other evidentiary rules or applicable authority.  Tenn. R. Evid. 402.  Of course, "[e]vidence which is not relevant is not admissible." *Id*.  Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id*. at 401.  Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id*. at 403.

Evidence of a defendant's character offered for the purpose of proving that the defendant acted in conformity with that character is not admissible.  *Id*. at 404(a).  Additionally, evidence of other crimes, wrongs, or bad acts is not admissible to prove the

character of a person to show action in conformity with that character. *Id*. at 404(b). Evidence of gang affiliation is character evidence subject to Rule 404(b). *State v. Orlando Crayton*, No. W2000-00213-CCA-R3-CD, 2001 WL 720612, at *3 (Tenn Crim. App., June 1, 2009), *no Tenn. R. App. P. 11 application filed*. Such evidence may be admissible, however, for "other purposes." *Id*. Our Supreme Court has determined that such "other purposes" include demonstrating motive or intent. *State v. Berry*, 141 S.W.3d 549, 582 (Tenn. 2004). A trial court's decision as to the admissibility of evidence will be reversed only upon a showing of abuse of discretion. *See State v. Powers*, 101 S.W.3d 383, 395 (Tenn. 2003); *State v.. James*, 81 S.W.3d 751, 759 (Tenn. 2002). When attempting to exclude otherwise admissible and relevant evidence, the individual seeking exclusion bears a "significant burden of persuasion." *James*, 81 S.W.3d at 757-58.

In allowing the Defendant's statements to be admitted into evidence during the trial, the trial court found that the evidence regarding gang affiliation was relevant and was not offered as character evidence but was offered to prove motive and intent of the Defendant. We agree. Officer Haywood testified that the Defendant described the negative repercussions he faced on the "street" for talking to the police, which explained his hesitation to provide a recorded statement. The officer also testified about the Defendant's statements during interviews, which included that the Defendant and Robert Guerrero were in the same gang and that Sparkman was affiliated with a gang associated with their gang. He described the three men as "folk" of each other. The Defendant also provided references to Robert Guerrero feeling "disrespected" when a rival gang member pushed him at the Armory and that Sparkman thought he saw the rival gang members leave in the Expedition at which Sparkman later shot. The Defendant said he felt sorry for the victims if they were innocent, but if they were from the "gang world," "he felt no remorse" because this was the life they chose. The aforementioned testimony was relevant to establish a motive for the shooting and to explain the Defendant's intent to assist in the shooting. In our view, the probative value of the evidence outweighed the danger of unfair prejudice. The Defendant is not entitled to relief as to this issue.

### B. Admission of Recorded Telephone Conversation

The Defendant contends that the trial court violated his Sixth Amendment right to confrontation by admitting into evidence the recorded telephone conversation between the Defendant and Charles Kelley. Kelley was not present at trial and, therefore, could not be cross-examined regarding the recording. The State responds that the trial court acted within its discretion after concluding that the statements were not hearsay.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible at trial except as provided by the rules or

otherwise by law. Tenn. R. Evid. 802. "The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court." *State v. Thomas*, 158 S.W.3d 361, 400 (Tenn. 2005).

The Confrontation Clause of the Sixth Amendment commands: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. This fundamental right of confrontation applies to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403 (1965); *see State v. Henderson*, 554 S.W.2d 117, 119 (Tenn. 1977). The Tennessee Constitution also guarantees the right of confrontation, providing "[t]hat in all criminal prosecutions, the accused hath the right to . . . meet the witnesses face to face . . . ." Tenn. Const. art. I, § 9. Although the language of the federal and state constitutional provisions differ slightly, the Tennessee Supreme Court has "traditionally adopted and applied the standards enunciated by the United States Supreme Court" when determining an accused's right to confront under the Tennessee Constitution. *State v. Cannon*, 254 S.W.3d 287, 301 (Tenn. 2008) (citing *State v. Lewis*, 235 S.W.3d 136, 144 (Tenn. 2007)).

The Confrontation Clause bars the admission of certain out-of-court statements unless the declarant "was unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 53-54. This bar applies only to statements defined by law as testimonial hearsay. *Id.*; *Davis v. Washington*, 547 U.S. 814, 823 (2006). The Confrontation Clause does not affect the admissibility of statements that do not fall within the traditional definition of hearsay. *State v. Anthony George Bell*, No. M2008-01187-CCA-R3-CD, 2009 WL 3925370, at *4 (Tenn. Crim. App., at Nashville, Nov. 19, 2009) (citing *U.S. v. Maher*, 454 F.3d 13, 20 (1st Cir. 2006); *State v. Johnson*, 771 N.W.2d 360 (S.D. 2009)), *perm. app. denied* (Tenn. Apr. 16, 2010). Regardless of whether the statement is testimonial or non-testimonial, therefore, the Confrontation Clause does not bar statements lacking assertive content, such as commands or questions. *State v. Charles O. Emesibe*, No. M2003-02983-CCA-R3-CD, 2005 WL 711898, *10 (Tenn. Crim. App., at Nashville, Mar. 28, 2005), *perm. app. denied* (Tenn. Oct. 17, 2005). Also, the Confrontation Clause does not bar a statement with assertive content but not offered for the truth of the matter asserted. *Id.*; *See Crawford*, 541 U.S. at 59 n.9.

In this case, the trial court found that rather than being offered for the truth of the matter asserted, each of Kelley's statements was introduced to give context to the Defendant's statements on the recording. Upon our review of the record, we agree with the trial court's finding that Kelley's statements were not offered for the truth of the matter asserted. The Defendant called Kelley and silenced Kelley twice, cautioning him not to speak. The Defendant told Kelley that the Defendant was being charged with two counts of first degree murder and spoke of the situation being "critical." He repeatedly said that "time would tell"

in reference to evidence recovered from the crime scene. The Defendant told Kelley that he returned to the scene and could not find the gun. The Defendant's statements, as the Defendant points out in his brief, are the statements the State used in closing argument and were properly admitted pursuant to Tennessee Rule of Evidence 803, which permits the admission of an out of court statement offered against the party that is the party's own statement. *See Tenn. R. Evid*. 803(1.2). The Defendant conveyed most, if not all, of the substance of the conversation with Kelley responses consisting largely of "yeah" or "the situation is critical/this s*** is ugly." As such, we conclude that Kelley's statements were not introduced for the truth of the matter asserted but rather to give context to the Defendant's statements during the recorded conversations. As a consequence, Kelley's statements were not introduced in violation of the Defendant's right to confront adverse witnesses. *See Crawford*, 541 U.S. at 53-54. The Defendant is not entitled to relief on this issue.

### C. Admission of the Defendant's Statements during Arrest

The Defendant argues that the trial court erred when it allowed two statements made by the Defendant "at the scene" of the crime into evidence during the trial. One statement referenced gunshot residue and the other statement referenced his intention to return to the scene to find the assault rifle and dispose of it. The State responds that, because the Defendant made the statements after being given Miranda warnings, the trial court acted within its discretion in admitting the statement.

### 1. Statement about Gunshot Residue

Initially, the police were notified of a "shots fired" incident and responded to the situation in a manner consistent with a shooting, drawing their weapons and instructing those present to raise their hands. Upon speaking with the Defendant and Guerrero, Officer Humphrey believed that there had not been a shooting but rather a vehicular assault of the vehicle in which the Defendant was traveling. Thus, the officer initially believed Robert Guerrero and the Defendant were victims of a vehicular assault. Officer Humphrey returned his weapon to his vehicle and began to process the scene as a traffic accident/aggravated assault. As the men waited for a wrecker to pull the gold Grand Am from the ditch, Officer Duke discovered an assault rifle lying near the car. After seizing this weapon, the officers handcuffed both Robert Guerrero and the Defendant and Mirandized them. The Defendant's hands were also bagged in an attempt to preserve any gunshot residue evidence for testing. After his hands were bagged, the Defendant asked Officer Humphrey how long gunshot residue remained on a person's hands after the person fired a weapon. It is this statement's introduction into evidence that the Defendant contends was in violation of his Miranda rights.

In reviewing a suppression hearing, factual determination by the trial court are given

the weight and effect of a jury verdict, and thus receive great deference. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000). The application of law to fact is reviewed de novo. *State v. Bridges*, 963 S.W.2d 487 (Tenn. 1997). The findings of the trial court will be upheld unless the evidence preponderates otherwise. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996).

The Fifth Amendment to the United States Constitution provides in part that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, article I, section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. The United States Supreme Court has held that the protections afforded by the Fifth Amendment require that precautions be taken before statements obtained through custodial interrogation are allowed as evidence against an accused. *Miranda v. Arizona*, 384 U.S. 436, 479 (1964). Generally, when statements made by an accused are the product of a custodial interrogation by law enforcement officers, the statements may not be admitted into evidence unless the accused is:

> Warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id*. Only when the suspect is informed of his rights via the Miranda warnings may a suspect be deemed to knowingly and intelligently waive the right to remain silent and the right to an attorney. *Id*. Moreover, any statement obtained after a waiver of this right must be voluntary and not be extracted by "any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Bram v. United States*, 168 U.S. 532, 542-43 (1987).

The protections provided under Miranda do not apply in every instance where a police officer questions a suspect; rather, these protections only apply "when the defendant is in custody and is subjected to questioning or its functional equivalent." *State v. Walton,* 41 S.W.3d 75, 82 (Tenn. 2001). Miranda warnings are required only when a person is subject to custodial interrogation by law enforcement. "Custodial" means that the subject of questioning is in "custody or otherwise deprived of his freedom by the authorities in any significant way." *Miranda*, 384 U.S. at 479. "Interrogation" has been interpreted to refer to questions that law enforcement officers should know are reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). In order for Miranda to apply, the suspect's statements must be in response to interrogation by law enforcement personnel, or the suspect must know that he is being interrogated by an agent of the State. *State v. Brown*, 664 S.W.2d 318, 321 (Tenn. Crim. App. 1983); *see Illinois v. Perkins*, 496 U.S. 292, 296-97 (1990).

"Absent either one of these prerequisites, the requirements of Miranda are not implicated." *Id*.

Our review of the record reveals that the Defendant asked the question regarding gunshot residue after he was Mirandized at the scene. Moreover, the Defendant's statement was spontaneous and not in response to interrogation. We conclude that the Defendant's statement was "knowing and voluntary" and, thus, not admitted in violation of his right against involuntary self-incrimination. *See Miranda*, 384 U.S. at 479. Therefore, the trial court did not err when it admitted the Defendant's question about gunshot residue. The Defendant is not entitled to relief as to this issue.

### 2. Statement about Disposal of Crime Weapon

The Defendant next asserts that the trial court erred when it admitted certain statements he made "at the scene" about disposing of the weapon, citing Tennessee Rule of Evidence 403. The State responds that the trial court acted within its discretion when it admitted the Defendant's statements regarding his intent to dispose of the gun used during the shooting.

As we discussed earlier in this opinion, the Tennessee Rules of Evidence provide that all "relevant evidence is admissible" unless excluded by other evidentiary rules or applicable authority. Tenn. R. Evid. 402. And again, relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id*. at 401. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id*. at 403.

Upon our review of the trial transcript, we are unable to locate any statements the Defendant made "at the scene" regarding his intent to dispose of the gun. Thus, we interpret his challenge to reference the admission of statements he made during interviews with detectives disclosing his intention to return to the scene and dispose of the assault rifle. During an initial interview, the Defendant told Officer Haywood that he initially fled the scene but returned to try to find the gun and dispose of it. The following day, in an interview with Detective Martin, the Defendant again stated that he returned to the scene to try to find the gun and further that, had he found the gun, he would have left the scene with it. The Defendant also mentioned his intention to dispose of the gun during his phone conversation with Kelley.

The trial court found that the statements were relevant, and were circumstantial evidence of both the Defendant's involvement in, and intent to participate in, the shooting. We

agree. The Defendant told detectives and Kelley that he initially fled the scene but returned to retrieve and dispose of the weapon. These statements were relevant in that they made the determination of the Defendant's involvement and participation in this crime "more probable" than not without this evidence. *See* Tenn. R. Evid. 403. Thus, we conclude that the trial court did not abuse its discretion when it admitted into evidence the Defendant's statements about his intention to return and retrieve the weapon. The Defendant is not entitled to relief as to this issue.

### D. Jury Instruction

The Defendant asserts that the trial court erred when it failed to instruct the jury as to the "natural and probable consequences" rule as to criminal responsibility. The State responds that the Defendant has waived this issue because he failed to request the instruction and failed to raise the issue in his motion for new trial.

Tennessee Rules of Appellate Procedure Rule 3(e), provides in part:

> [I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived. . . .

Thus, issues of jury instructions given or refused by the trial court are waived if the issues were not included in the motion for a new trial. *State v. Keel*, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994).

As the State has noted, the Defendant did not raise his objection to the trial court's failure to instruct the jury on the "natural and probable consequences" rule in his motion for new trial. Thus, we conclude that our review of this issue has been waived.

### E. Denial of Motion for Judgment of Acquittal

In the Defendant's final issue, he claims that the trial court erred when it denied his motion for a judgment of acquittal on all counts because the evidence was insufficient to support convictions for first degree murder, felony murder, and attempted first degree murder. The State responds that the trial court properly denied the Defendant's motion for judgment of acquittal.

-21-

Rule 29 of the Tennessee Rules of Criminal Procedure provides, in relevant part, as follows:

> On Defendant's motion or its own initiative, the court shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, presentment, or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

Tenn. R. Crim. P. 29(b). This rule empowers the trial judge to direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the State rests or at the conclusion of all the evidence. *See generally Overturf v. State*, 571 S.W.2d 837 (Tenn.1978). By presenting evidence, however, a defendant generally waives his ability to appeal a trial court's denial of his motion for a judgment of acquittal. *Finch v. State*, 226 S.W.3d 307, 317 (Tenn. 2007).

In this case, the trial court denied the Defendant's motion for judgment of acquittal raised at the close of the State's proof. Following this denial, the Defendant presented evidence. The Defendant, therefore, waived his right to appeal the denial of his motion for judgment of acquittal raised at the close of the State's proof. *Id*. at 317. At the close of the Defendant's proof, however, the Defendant made another motion for judgment of acquittal which the trial court also denied. Thus, it is the second motion denied that we now review, and in doing so, we will address all evidence, not just that brought during the State's case-in-chief.

The standard by which the trial court determines a motion for judgment of acquittal is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction. *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); *State v. Anderson*, 880 S.W.2d 720, 726 (Tenn. Crim. App. 1994). A motion for a judgment of acquittal is a question of law and, thus, the trial court reviews only the legal sufficiency of the evidence and not the weight of the evidence. *State v. Adams*, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995); *State v. Campbell*, 904 S.W.2d 608 (Tenn. Crim. App. 1995). To determine whether the evidence is insufficient to sustain the conviction, the trial court must consider "the evidence introduced by both parties, disregard any evidence introduced by the accused that conflicts with the evidence adduced by the State, and afford the State the strongest legitimate view of the evidence, including all reasonable inferences which may be drawn from the evidence. *Id*. (citing *State v. Hall*, 656 S.W.2d 60, 61 (Tenn. Crim. App.1983)). Pursuant to this standard, the trial court properly denied the appellant's motion at the conclusion of all the evidence.

In the case under submission, the Defendant was convicted of first degree murder, felony murder, and attempted first degree murder under the theory of criminal responsibility.

Tennessee Code Annotated, section 39-11-402 provides the following:

> A person is criminally responsible for an offense committed by the conduct of another, if:
>
> (1) Acting with the culpability required for the offense, the person causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense;
>
> (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense; or
>
> (3) Having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the person fails to make a reasonable effort to prevent commission of the offense.

Criminal responsibility is not a separate crime but "solely a theory by which the State may prove the defendant's guilt of the alleged offense, . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). The legislative intent in promulgating the theory of criminal responsibility is to "embrace the common law principles governing aiders and abettors and accessories before the fact." *State v. Carson*, 950 S.W.2d 951, 955 (Tenn. 1997). Under the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred. *See State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). No particular act need be shown, and the defendant need not have taken a physical part in the crime. *See id*. Mere encouragement of the principal will suffice. *See State v. McBee*, 644 S.W.2d 425, 428 (Tenn. Crim. App. 1982). To be criminally responsible for the acts of another, the defendant must "'in some way associate himself with the venture, act with the knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting *Hembree v. State*, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)). Thus, for a conviction for first degree murder, attempted first degree murder, and felony murder, the State need only prove that the Defendant intended to assist in the shooting murders and attempted murders of the remaining passengers.

First degree murder is "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2003). Felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery,

burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, or aircraft piracy." T.C.A. § 39-13-202(a)(2).

"A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101(a)(3). As we stated earlier, first degree murder is the "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). Thus, the offense of attempted first degree murder requires a premeditated and intentional attempt to kill another.

The evidence considered in the light most favorable to the State proves that the Defendant and his co-defendants attended a party at the National Guard Armory during which a fight broke out. A member of a rival gang shoved Robert Guerrero, and the Defendant and Sparkman intervened on Robert Guerrero's behalf. Robert Guerrero felt "disrespected" by the rival gang members. Police escorted Sparkman from the building, and, in the parking lot, Sparkman saw individuals who he believed to be those who shoved Robert Guerrero get into an Expedition.

Sparkman, Guerrero, Kelley, and the Defendant left the Armory in the same car and began traveling Nashville Highway. Sparkman soon identified the Expedition on Nashville Highway, and Robert Guerrero caught up to the Expedition. The Defendant said that, because he knew Sparkman intended to shoot at the Expedition, he warned Sparkman that a vehicle that was traveling behind them might witness his actions. After multiple shots were fired at the Expedition, the Expedition forced the car in which the Defendant, Guerrero, Kelley, and Sparkman traveled off the road and into a ditch. As Sparkman, Kelley, and the Defendant fled the vehicle, the Defendant inquired as to the location of the weapon. Upon learning that Sparkman had left the weapon behind, the Defendant instructed Sparkman to retrieve it because it was evidence that would link them to the crime. When Sparkman continued to flee, the Defendant returned to the scene to find and dispose of the weapon. The Defendant was unable to find the weapon but was able to wipe away gunshot residue on the car seat. When the police arrived, the Defendant allowed them to believe he was a victim of a vehicular assault, and he maintained this story even after the rifle was recovered and he was placed under arrest. In subsequent interviews with detectives, the Defendant acknowledged his involvement when he stated to detectives that, "he should not be felt sorry for, because . . . this is the life that he chose to live. And the fact that he is involved is just a product of that life."

Based upon this evidence, we find that a jury could find the Defendant, under the theory of criminal responsibility, guilty of first degree murder, felony murder, and attempted first

-24-

degree murder. The Defendant was not entitled to an acquittal under this evidence and is not entitled to relief as to this issue.

### III. Conclusion

Based upon the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE